# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIOVANNI THOMAS JASSO, | Case No. 1:24-cv-00133-KES-SAB-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| GISELLE MATTESON, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On March 29, 2019, Petitioner was convicted after a jury trial in the Kern County Superior Court of first-degree murder (count 1) and unlawful participation in a criminal street gang (count 2). The jury found true various special allegations and enhancements. (5 CT[1] 1392–95.) On May 1, 2019, Petitioner was sentenced to an imprisonment term life without the possibility of parole on count 1 plus twenty-five years to life for a firearm enhancement. The sentence for count 2 was stayed. (6 CT 1533–36.) "The gang enhancement was omitted from the pronouncement of judgment without explanation." (ECF No. 15-5 at 17.[2])

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent. (ECF Nos. 13–14.)
[2] Page numbers refer to the ECF page numbers stamped at the top of the page.

On June 22, 2022, the California Court of Appeal, Fifth Appellate District reversed the conviction of unlawful participation in a criminal street gang and all gang enhancements but otherwise affirmed the judgment in all other respects. (ECF No. 15-5 at 71.) On October 12, 2022, the California Supreme Court denied Petitioner's petition for review. (LDs[3] 39, 40.)

On January 5, 2024, Petitioner filed the instant federal petition for writ of habeas corpus raising the following claims for relief: (1) sufficiency of the evidence; (2) erroneous admission of prejudicial gang evidence; and (3) cumulative error. (ECF No. 1.) On March 22, 2024, Respondent filed an answer. (ECF No. 11.) On October 4, 2024, Petitioner filed a traverse. (ECF No. 32.)

## II.

## STATEMENT OF FACTS[4]

On July 21, 2017, victim Abraham Rubio (age 17) was shot while walking on Paradise Road in Lamont. The shooting occurred in front of a house rented by defendant Jose, his girlfriend, and the girlfriend's mother. Jose's girlfriend called 911 after hearing the gunshots and seeing the wounded victim in distress.

A sheriff's deputy arrived soon after the emergency dispatch. Rubio was able to provide his name and age but declined to answer questions about the shooting. He died from internal injuries later that evening. A postmortem toxicology analysis indicated prior consumption of alcohol, marijuana, and methamphetamine.

The deputy had found Rubio in the street lying on his back in between a Ford Bronco and a Lincoln pickup truck. The vehicles were parallel parked along the southern curb of Paradise Road, facing east. The Bronco was parked west of the driveway to Jose's residence, and the Lincoln was parked a few feet behind the Bronco. Four 9-millimeter bullet casings were located northeast of the Bronco, within approximately eight feet of where Rubio had fallen after being shot. Three of the casings were of the same brand, but the fourth was made by a different manufacturer.

Rubio sustained two bullet wounds to the right abdominal area. A third bullet hit his left thigh, close to the knee. The fourth shot apparently missed him. Investigators found a bullet lodged above the front driver's side bumper of the Lincoln truck, close to where Rubio had collapsed.

The events were captured on video by a security camera located outside of a nearby restaurant. The video showed that four people had either witnessed or participated in the shooting. After reviewing hours of footage and conducting further investigation, detectives obtained arrest warrants for Juan (age 22), Jose (age 21), and Jasso (age 19). Search warrants were obtained for defendants'

[3] "LD" refers to the documents lodged by Respondent. (ECF Nos. 12–15.)
[4] The Court relies on the California Court of Appeal's June 22, 2022 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

2

Facebook accounts and "to ping the realtime location" of a phone associated with Juan. Authorities did not seek to arrest the fourth suspect, Kasey Villegas, who was later stabbed to death in an unrelated incident.

On July 27, 2017, a relative turned Rubio's mobile phone over to law enforcement. It was covered in dried blood. The person did not explain how the item was obtained but alleged it had "passed through several different hands." The name of a local gang, "Varrio Chico Lamont," was etched into the back of the device.

On August 4, 2017, Jasso was taken into custody during a traffic stop. He waived the right to remain silent and briefly answered questions about the shooting. Jasso stated that he lived in Bakersfield. He denied knowing anyone in Lamont or being there on the day of the incident.

On August 5, 2017, Jose was arrested at his home. He waived the right to remain silent and submitted to a lengthy interrogation. Jose's girlfriend voluntarily accompanied him to the Kern County Sheriff's Office and, while there, she agreed to answer questions about the shooting. Both interviews were recorded.

Jose told detectives that the victim, Rubio, had previously lived in the house he had rented on Paradise Road. Rubio was also a longtime friend of Jose's girlfriend. The details were vague, but Jose alleged Rubio had shown up at his residence under the influence of narcotics on the day in question. Rubio had wanted to discuss drug dealing, and Jose told him that he did not want any drug trafficking near the house. Jose had been polite, but Rubio was upset by the conversation.

Rubio departed from Jose's residence but confronted him again "like, three more times" that day. The second encounter was outside of a liquor store. Rubio still appeared to be "on drugs," and Jose claimed to have "smelled alcohol on his breath." Rubio challenged Jose to a fistfight, but Jose declined. He had been concerned about Rubio's friends, explaining to detectives that "some of his buddies that he knows that he grew up with, they were right there around him." Jose further claimed to have told Rubio, "[I]f I even touch you, I know you're gonna go tell your friends. And your friends are gonna come try to beat me up." Jose said this incident occurred around 5:00 p.m.

Jose did not recount any further interactions with Rubio prior to the shooting. He claimed to have been asleep when the shots were fired, which was shortly after 8:00 p.m. In Jose's initial story, the sound of gunfire woke him from a nap. He then went outside to investigate and render aid. Jose denied having had any other visitors that day except for his girlfriend's father and someone who came over to see his girlfriend's mother.

A detective asked Jose, "Why are people on the streets sayin' that you and [Rubio] were fightin' over some tagging?" He replied, "Exactly. That was the whole reason." He then explained Rubio had been upset about some graffiti on an abandoned house previously occupied by Rubio's grandmother. Jose alleged the graffiti was placed there five years earlier by one of his friends, but it included Jose's nickname ("Toker"), so Rubio had assumed Jose was involved.

Jose admitted the "tagging" of Rubio's grandmother's house included references to a Bakersfield gang called Varrio Bakers. Jose had previously lived in Bakersfield, but he denied being a gang member and downplayed the significance

3

of a gang-related tattoo on his hand. When pressed about the gang angle, Jose said the dispute with Rubio was *not* about the graffiti and only concerned Rubio's drug use and drug dealing. The detectives then confronted Jose with still images from the surveillance video.

When Jose was shown images of his brother (Juan), Jasso, and Kasey Villegas, he denied knowing any of them. He stuck to the story about being inside the house when Rubio was shot. Amid repeated denials, Jose remarked, "I could've died too." A detective then asked, "Why, did [Rubio] have a gun?" Jose answered, "I don't know if he had a gun[,] [but] I could've got shot that day he was calling me out." Jose was then asked, "Did he pull a gun on you?" He replied, "No."

Jose eventually admitted to being in his front yard when the shooting occurred but denied seeing who fired the shots. Conceding his prior dishonesty, he said, "I'm sorry that I did fall off the train a little bit. ... But at the same time it's 'cause I have four beautiful kids. ... I didn't want anything to happen to me, to my kids, or, like, to Rubio, or to my family. ... I know I left some parts out about what [Rubio] said. But, like I said, I ain't a bitch or a—a snitch or whatever it is. ... I just don't want, like, you guys think that I'm the one that did it." When asked again if Rubio was armed, Jose continued to deny having seen anything. He later made a comment about knowing "my brother's buddies did it," implying he came to that realization after being shown the surveillance images.

Jose's girlfriend corroborated parts of his story but also contradicted him on important details. She claimed to have witnessed Rubio's initial argument with Jose over the "tagging" of his grandmother's house. Rubio had wanted to "go to the alley and [fight]," referring to an alley intersecting Paradise Road between the restaurant and the home of Jose's neighbor, i.e., the house adjacent to the Ford Bronco and the Lincoln pickup truck.

The girlfriend discussed how Jose went to the liquor store and returned alleging Rubio had confronted him again, this time with "all his homies." She also referred to Rubio's friends as "gangsters from Lamont." Whereas Jose had generally characterized the dispute as a minor "misunderstanding," the girlfriend alleged Rubio had threatened to obtain a firearm and kill Jose. Rubio was supposedly living with her uncle at the time, and she believed her uncle would have let Rubio borrow his gun. Her exact statement was, "Jose has told me, well, Jose, if it wasn't [Rubio], it would have been Jose, cuz (unintelligible) if you guys would have heard what he was saying to Jose about him killing him too or shooting him and I know my [uncle] has a gun and he would have lended [*sic*] it to him."

Jose's girlfriend identified Jasso and Juan from the surveillance images. She confirmed they had visited Jose that evening, which she admitted was "weird" because Juan, who lived in Bakersfield, rarely travelled to Lamont. She had suspected the visit had something to do with Rubio and claimed to have warned Juan, "[Y]ou better not do nothing stupid." She further alleged Jose later confided to her that Juan was the shooter.[5]

---

[5] Jose's alleged identification of Juan as the shooter was redacted from the recording used at trial. Part of the redacted material was potentially exculpatory as to Jose and Jasso. According to the girlfriend, Jose had told her, "I believe it was my brother but I don't know. He just popped, it happened so quick and I told him not to ... ." Jasso's attorney objected to the redaction but was overruled. The redacted version makes clear Jose's girlfriend believed Juan was the shooter but omits the explanations as to why.

Juan was arrested on the same day as Jose. It is unclear from the record whether he submitted to custodial interrogation.

On September 5, 2017, detectives recontacted Jose's girlfriend and arranged to speak with her younger sister, who was a juvenile. Jose's girlfriend had previously identified her sister as an eyewitness to the shooting. The sister denied this and claimed she was inside with Jose when the shots were fired. However, the sister admitted to having let Jose use her mobile phone earlier that day. The detectives photographed her call log, which showed calls to and from Juan's phone between 5:10 p.m. and 6:32 p.m. The sister denied placing those calls herself or recognizing the phone number.

In January 2018, while speaking with a sheriff's deputy, the sister reportedly claimed to have seen Juan shoot Rubio. According to the deputy, the sister admitted to being untruthful with the homicide detectives and alleged unspecified family members "had told her to lie to try to protect Juan." The sister allegedly believed Juan shot Rubio because Rubio "had kicked in his door and robbed him and ... had committed crimes against him in the past." In the prior interview with detectives, she claimed to have heard Jose say he feared Rubio because Rubio "said he was gonna get a gun to shoot him."

Defendants were each charged with first degree murder (§§ 187, 189; count 1) and unlawful participation in a criminal street gang (§ 186.22, subd. (a); count 2). Juan was additionally charged with possession of a firearm by a convicted felon (§ 29800, subd. (a)(1); count 3). Count 1 included special circumstance allegations of lying in wait (§ 190.2, subd. (a)(15)) and murder committed to further the activities of a criminal street gang (*id.*, subd. (a)(22)). Firearm and gang enhancement allegations were also included. (§§ 186.22, subd. (b), 12022.53, subds. (d), (e)(1).)

As to Juan only, two prior convictions were alleged for purposes of the "Three Strikes" law. (§§ 667, subds. (b)–(i), 1170.12.) The strike offenses of second degree robbery and unlawful participation in a criminal street gang were alleged to also qualify as prior serious felony convictions under section 667, subdivision (a). Juan was further alleged to have served two prior prison terms within the meaning of section 667.5, former subdivision (b).

Defendants were jointly tried before a jury in early 2019. The prior conviction allegations against Juan were decided in a subsequent bench trial. Jasso filed multiple unsuccessful motions to be tried separately from Jose and Juan. Jasso also filed a motion, in which Jose and Juan joined, to bifurcate all "gang counts and gang allegations."[6] The requests for bifurcation were denied.

*Prosecution Case*

The People's case included testimony from homicide detectives and a gang expert. The expert opined Jose, Juan, and Jasso were all active members of a criminal street gang called Varrio Bakers at the time of the shooting. The opinion was based on defendants' criminal history, tattoos, and content found on their social media accounts. The gang evidence is summarized in the Discussion, *post.*

---

[6] Technically, Juan did not join in Jasso's motion but filed a separate motion in limine "to clarify and limit gang evidence," which the trial court treated as a motion to bifurcate and heard in conjunction with Jasso's motion. Jose filed a similar motion to "limit" the gang evidence, which the trial court likewise construed as a motion to bifurcate, and Jose's trial counsel joined in the arguments made by Jasso's attorney during the motion hearing.

Jose's girlfriend and her sister were examined as hostile witnesses. Redacted recordings of their interviews with detectives, as well as the interviews of Jose and Jasso, were admitted into evidence. Several crime scene photographs were also admitted.

All parties agreed to a jury view of the crime scene. This occurred on the third day of evidence presentation. In addition to walking along the relevant sections of Paradise Road and Velma Avenue, the jury was driven past the "dilapidated, burnt-out house" previously occupied by Rubio's grandmother.[7]

The restaurant's surveillance video was, in the People's words, "the keystone of the prosecution's case." Over three hours of footage was admitted into evidence. A 24-hour clock on the video showed the time of day down to one-thousandth of a second, but it was reportedly off by about two minutes. All times noted herein are approximated without the two-minute adjustment and primarily stated in a 12-hour format for ease of reference. Summarized in the light most favorable to the judgment, the video depicted the following events.

At 5:07 p.m., Rubio walked southbound on Velma Avenue and veered slightly west at the intersection of Paradise Road. He continued southwest toward Jose's residence, which faced Paradise on the opposite corner of the intersection. After gesturing to someone at or near Jose's property, Rubio moved in front of the Ford Bronco and lingered there for about 25 seconds. At 5:08 p.m., Rubio took a few steps toward Jose's house and appeared to enter the driveway. He then disappeared from the camera's view for about one minute. The prosecutor alleged this was the initial dispute described by Jose and his girlfriend in their recorded interviews.

At 5:09 p.m., Rubio walked away from Jose's residence. He stopped in front of the Ford Bronco for about 45 seconds, during which time he was obscured from view. He eventually proceeded west, past the Bronco and Lincoln truck, and moved toward the sidewalk on the southern side of Paradise Road. At 5:10 p.m., he stopped at the alley and turned back toward Jose's residence as if calling out to someone. He then turned around and continued walking toward the restaurant. His fists were clenched as he passed by the camera and out of view.

At 5:11 p.m., Jose exited his driveway and walked into the street. He looked west, in the direction Rubio had just gone, and appeared to be on a phone call. This was consistent with the call log of Jose's girlfriend's sister's phone, which showed a call placed to Juan at 5:10 p.m. At 5:13 p.m., Jose left his house and walked west on Paradise Road. He was off camera for about five minutes and reappeared shortly before 5:19 p.m., heading east on Paradise before disappearing from view near his house. As indicated by the call log, Jose then placed a second call to Juan.

At 5:23 p.m., Rubio walked east on Paradise Road and turned north at the Velma Avenue intersection. Fifteen minutes later, he reappeared with an unidentified man. They emerged from Velma Avenue, walked into the Paradise Road intersection, and stood there in conversation for half a minute. The man then returned in the direction from which he had come, and Rubio continued walking south on Velma.

---

[7] The trial court informed the jury, "The house was burned down and delipidated [*sic*] long before the date of the shooting. [The condition of the house] is completely unrelated to the case but there's graffiti. You haven't heard about this graffiti yet but you'll hear about it from other witnesses."

At 6:15 p.m., Jose walked out to the middle of Paradise Road. He appeared to be on a phone call, which corresponded to the call log showing an outgoing call to Juan's phone at 6:14 p.m. Jose eventually strolled westbound on Paradise, then came jogging back toward his house at 6:18 p.m. Moments later, Jasso, Juan, and Kasey Villegas drove up in Jasso's black Honda Civic, stopping in front of the restaurant. Jose walked to the north side of the street and gestured for the car to drive north through the alley running parallel to Velma Avenue. The car pulled away from the curb and drove up the alley. Jose walked off along the northern side of Paradise, disappearing from the camera's view after turning north on Velma.

A black sedan, which the People alleged was Jasso's car, circled through the area again at 6:29 p.m. At 7:09 p.m., the car turned west onto Paradise Road from northbound Velma Avenue and parallel parked along the northern curb, directly across from Jose's residence. Jasso exited the car alone, crossed the street, and disappeared from view into Jose's driveway. Jose, Juan, and Kasey Villegas had evidently gone to the house on foot at some earlier point in time.[8]

At 7:14 p.m., Jose, Juan, Jasso, and Kasey Villegas exited Jose's driveway on foot and proceeded west on Paradise Road. They returned four minutes later, heading east, and Jose was now carrying a bulging plastic grocery bag. All four men appeared to be scanning the area as they walked, turning their heads and looking in various directions before moving into Jose's driveway and out of view.

The prosecutor theorized defendants had roamed the neighborhood in search of Rubio for about an hour. Unable to find him, they decided to wait outside of Jose's residence. At 7:32 p.m., Jasso walked out to the middle of Paradise Road, paused, and then returned to Jose's driveway. At 7:47 p.m., Juan came out of the driveway, proceeded west, and stood between the Ford Bronco and Lincoln pickup truck for approximately 15 seconds. He then continued west on Paradise, stopped at the alley next to the restaurant, and stood watch for about 45 seconds before returning to Jose's driveway. Meanwhile, Jose walked out onto Paradise Road, looked around, and was joined by Jasso near the front end of the Bronco. By 7:50 p.m., all three had returned to Jose's driveway and were no longer visible on camera.

At 8:00 p.m., Rubio walked past the restaurant along the southern curb of Paradise Road. He was holding a bottle of beer in his left hand.[9] Shortly before moving past the alley, he entered the street and continued on a northeastward trajectory toward Velma Avenue, taking a swig of his beer while passing by the Lincoln pickup truck. At virtually the same moment (20:00:57 on the video clock), Jasso exited the driveway and walked in front of the Ford Bronco. Six seconds later, Juan appeared on camera.

Juan also stepped in front of the Bronco, but he was closer to it than Jasso. Rubio suddenly turned to his right (i.e., toward Juan), took a step backwards while extending both arms out from his waist, then staggered farther backwards and fell down in between the Bronco and the pickup truck. He ceased to be visible at approximately 20:01:07 on the video clock.

---

[8] The video shows movement outside of Jose's residence, near the corner of Paradise Road and Velma Avenue, at 6:32 p.m. About one minute later, a person resembling Kasey Villegas comes into view and then walks off camera at the approximate location of Jose's driveway.

[9] Sheriff's deputies later found an aluminum Bud Light beer bottle near Rubio's body. It was visible in some of the crime scene photographs admitted at trial.

Jasso had first come into view at approximately 20:00:57 and remained in front of the Bronco until approximately 20:01:09. Juan came into view at approximately 20:01:03, disappeared in front of the Bronco at 20:01:05, and reappeared at 20:01:10 running toward Jasso's parked car across the street. Meanwhile, Jose and Kasey Villegas stepped out of the driveway and into the camera's view at 20:01:07. Kasey turned back around almost immediately, and Jose did the same approximately one second later. Jasso, from his position in front of the Bronco, very briefly moved in the direction of Jose and Kasey but then turned and ran across the street to his car (arriving there a few steps behind Juan). A few seconds later, Kasey ran after Juan and Jasso and fled with them in Jasso's vehicle.

Jasso drove west on Paradise Road at 8:01 p.m. His vehicle disappeared from the camera's view when the video clock hit 20:01:30. At 8:02 p.m., Jose and his girlfriend exited the driveway. Jose jogged over to where Rubio lay, knelt down for a few seconds, then stood up and jogged back to his house. Jose's girlfriend walked around the Bronco and momentarily looked down at Rubio before moving in between the vehicles and out of view for about 30 seconds. Unidentified onlookers began to approach the scene and watched from a distance as Jose's girlfriend paced back and forth near Rubio's body, appearing to talk on a phone.

At 8:04 p.m., a person later alleged to be Jose's neighbor walked in between the vehicles and disappeared from the camera's view. About 24 seconds later, he returned to the southern curb of Paradise Road and handed something to an unknown person. A sheriff's deputy pulled up in a patrol car shortly thereafter.

*Defense Case*

Jasso's defense was mere presence during the shooting. He testified on his own behalf. His attorney introduced photographs of Rubio displaying "gang signs" with his hands and fingers, which had been uploaded to Rubio's Facebook account one day prior to his death. Defense counsel also introduced what had reportedly been Rubio's Facebook "cover photo" in November 2015, i.e., two years prior to the shooting. It is described in the record as "a photograph of two semi-automatic pistols with the words 'May God have mercy on my enemies because I won't.' "

Jasso preemptively stipulated to being "an active participant in the Varrio Bakers" and to "knowingly sell[ing] illegal narcotics for a profit with other members of the Varrio Bakers." He alleged Jose, Juan, and Kasey Villegas were fellow Varrio Bakers members. Jasso also admitted to having made false statements during his custodial interview.

Regarding the day of the shooting, Jasso testified, "Juan had called me, told me he wanted to go visit with Jose and his kids. [Jose] had just moved into his new house." Jasso agreed to drive Juan to Lamont in his Honda Civic. Kasey Villegas joined them.

Jasso testified there was never any discussion among the group about Rubio or the possibility of a confrontation in Lamont. His expectations for the trip were to "have a couple of beers, smoke a blunt, [and] catch up with Jose." Rubio was a person completely unknown to him, even at the time of the shooting. He stated, "I never knew who he was. The first time I heard about him was when I got arrested for this case."

In his initial telling of the events, Jasso omitted nearly an hour's worth of activity. He testified to arriving in Lamont with Juan and Kasey, smoking marijuana with them while parked in front of Jose's house, getting out and socializing with Jose in the front yard "for a little bit," and then walking to the store to purchase some Tecate beer. Jasso confirmed the video footage at 7:14 p.m. and 7:19 p.m. showed the four of them on their beer errand.

On cross-examination, Jasso admitted that the video showed him exiting his parked car alone at 7:09 p.m. and walking to Jose's residence. The prosecutor asked where he had been "for almost an hour, 51 minutes about, after you first arrived in Lamont?" Jasso testified to dropping Juan and Kasey off on the Velma Avenue side of Jose's residence "when we first arrived," then traveling alone to the town of Arvin to deliver a package of cocaine. This was not entirely consistent with the footage of Jose standing in the street at 6:18 p.m., directing Jasso away from his house, and Jasso proceeding to drive north with his passengers still in the vehicle. In other testimony, Jasso alleged Jose had been pointing in the direction of where he intended to meet someone to buy marijuana.

Jasso gave the following testimony about the shooting: "As I'm—as we're walking out of the gate, I had to leave early to go pick up my girl from work and as we're walking out, I don't know. I guess I thought it was one of Jose's friends or something. He just—Jose told him like, 'I told you I'm not trippin.' [¶] [Rubio] goes, 'I don't give a fuck. I'm keeping my palabra [word].' "

After followup questions about Jose's and Rubio's exact statements, Jasso continued: "Yeah, it was something like that because me and Kasey were walking out. We were talking. I heard Jose say something about, 'I already told you I'm not trippin.' The car is right here. As I come around, I see someone approaching us. [¶] He's already saying, 'I don't give a fuck. I already told you. I keep my palabra' ... ."

Jasso's attorney asked, "Did you see [Rubio] with something in his hand?" Jasso answered, "Yes, well, he grabbed—he went under his shirt. He pulled out like those little—you know those guns off the side races, those little black revolvers from the movies that they show when they start the race." Defense counsel then asked, "You saw him with a small handgun?" Jasso replied, "Yeah, it's like a revolver."[10]

Describing the sequence of events, Jasso testified: "So I seen him pull it out. I dodged behind the car. I just heard four pops, so I thought we were getting shot at and [Jose's child] was outside. [¶] ... [¶] So I ran to the gate and closed the gate and then when I turned back around, it was just like [Rubio] wasn't standing there no more so we took off."[11]

---

[10] On cross-examination, the prosecutor had Jasso confirm the gun he allegedly saw in Rubio's possession was a revolver. This was an important detail because, as explained by a law enforcement witness, when an automatic pistol is fired the spent bullet casing is "ejected from the firearm[,] which causes the following rounds to be loaded into the barrel or chamber if there's accompanying rounds in it." When shots are fired from a revolver, however, the empty casings remain inside the gun until manually removed. Although one of the casings found at the scene was of a different brand than the other three, that did not necessarily indicate the use of two guns. But if there were two gunmen, Rubio's alleged possession of a *revolver* meant the second shooter was almost certainly not him.

[11] Jasso's reference to the "gate" was not explained, but it likely made sense to the jury given their trip to the crime scene. The crime scene photos showed chain link fencing in front of Jose's house and the home of his neighbor. The neighbor's driveway, located between the Ford Bronco and Lincoln truck, was blocked by a metallic fence-like gate. Jose may have had a similar gate for his driveway, but the space was open in the photos admitted at trial. In any

9

1

2      Jasso denied knowing Rubio had been shot when he fled the scene. He testified,
       "[T]o my understanding, [Rubio] was the one that was shooting at us." When
3      Jasso, Juan, and Kasey got into the car, Juan asked, " 'You guys all right?' " Jasso
       claimed to have replied, " 'Yeah, fuck. I'll take you guys home. I have to pick up
4      my bitch.' " His testimony indicated there was no discussion of the incident on
       the drive back to Bakersfield. Jasso did not ask Juan about the person who had
5      shot at them, i.e., Rubio, because he "was pretty sure Juan wouldn't know who he
       was either."

6      Jose rested his defense case without introducing any evidence. Like Jasso, he
7      relied on a theory of mere presence. His trial counsel argued Jose had truthfully
       told detectives that he did not see who fired the shots. Counsel also disputed the
8      People's theory of aiding and abetting, claiming the evidence allowed for a
       reasonable doubt on the element of intent. Jose's attorney did not argue self-
       defense.
9

10     Juan did not call any witnesses, but his attorney introduced additional content
       from Rubio's Facebook account to argue Rubio was a Varrio Chico Lamont gang
11     member or associate. Building upon Jasso's testimony about Rubio being armed,
       Juan's counsel alleged certain video footage showed a black handgun in Rubio's
12     waistband. Counsel offered multiple alternative defense theories during closing
       argument, including self-defense and defense of others.

13     (ECF No. 15-5 at 3–16 (footnotes in original).)

14                                           **III.**

15                                **STANDARD OF REVIEW**

16            Relief by way of a petition for writ of habeas corpus extends to a person in custody

17     pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

18     or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

19     529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed

20     by the U.S. Constitution. The challenged convictions arise out of the Kern County Superior

21     Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

22            On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

23     of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

24     enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th

25     Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is

26     therefore governed by its provisions.

27     ────────────────────────
       event, the prosecutor argued Jasso's testimony about closing the gate was demonstrably false. His movement toward
28     Jose's house before running in the opposite direction happened in less than two seconds, and Jose was in front of
       Jasso when Jasso turned around to flee.

                                            10

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The Court looks to the last reasoned state court decision as the basis for the state court judgment. Wilson v. Sellers, 584 U.S. 122, 125 (2018); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this Court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has

1    denied relief, it may be presumed that the state court adjudicated the claim on the merits in the

2    absence of any indication or state-law procedural principles to the contrary." <u>Richter</u>, 562 U.S. at

3    99. This presumption may be overcome by a showing "there is reason to think some other

4    explanation for the state court's decision is more likely." <u>Id.</u> at 99–100 (citing <u>Ylst v.</u>

5    <u>Nunnemaker</u>, 501 U.S. 797, 803 (1991)).

6           Where the state courts reach a decision on the merits but there is no reasoned decision, a

7    federal habeas court independently reviews the record to determine whether habeas corpus relief

8    is available under § 2254(d). <u>Stanley</u>, 633 F.3d at 860; <u>Himes v. Thompson</u>, 336 F.3d 848, 853

9    (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional

10   issue, but rather, the only method by which we can determine whether a silent state court

11   decision is objectively unreasonable." <u>Himes</u>, 336 F.3d at 853. While the federal court cannot

12   analyze just what the state court did when it issued a summary denial, the federal court must

13   review the state court record to determine whether there was any "reasonable basis for the state

14   court to deny relief." <u>Richter</u>, 562 U.S. at 98. This Court "must determine what arguments or

15   theories . . . could have supported, the state court's decision; and then it must ask whether it is

16   possible fairminded jurists could disagree that those arguments or theories are inconsistent with

17   the holding in a prior decision of [the Supreme] Court." <u>Id.</u> at 102.

18                           **IV.**

19                 **REVIEW OF CLAIMS**

20        **A.  Sufficiency of the Evidence**

21          In his first claim for relief, Petitioner asserts that there was insufficient evidence to

22   support his conviction for aiding and abetting murder. (ECF No. 1 at 133–35.) Respondent

23   argues that the state court reasonably rejected this claim. (ECF No. 17 at 13.) The California

24   Court of Appeal denied the claim in a reasoned opinion. The California Supreme Court

25   summarily denied Petitioner's petition for review. As federal courts review the last reasoned

26   state court opinion, the Court will "look through" the summary denial and examine the decision

27   of the California Court of Appeal. <u>See</u> <u>Wilson</u>, 584 U.S. at 125.

28   ///

In denying the sufficiency of the evidence claim, the California Court of Appeal stated:

Jasso's murder conviction was based on a theory of aiding and abetting. He seeks reversal of count 1 for insufficient evidence. The People dispute the claim.

## A.    Standard of Review

"On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt." (*People v. Boyer* (2006) 38 Cal.4th 412, 479.) We construe the record in the light most favorable to the judgment and presume "'the existence of every fact the jury could reasonably have deduced from the evidence.'" (*People v. Mendez* (2019) 7 Cal.5th 680, 702.) "'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.'" (*People v. Grant* (2020) 57 Cal.App.5th 323, 330.)

It is the jury's role "to decide whether an inference should be drawn and the weight to be accorded the inference." (*People v. Massie* (2006) 142 Cal.App.4th 365, 374.) "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054.) "If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139; accord, *People v. Ghobrial* (2018) 5 Cal.5th 250, 278.)

## B.    Law and Analysis

An aider and abettor is one who acts "with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) To be guilty of first degree murder, the aider and abettor must share the mens rea of the actual killer. (See § 188, subd. (a)(3); *People v. Gonzalez* (2012) 54 Cal.4th 643, 653 ["A person who kills unlawfully and intentionally is guilty of first degree murder if the intent to kill is formed after premeditation and deliberation"].) The required actus reus is conduct "that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

Jasso argues he was not shown to have encouraged or assisted in the murder of Rubio. To assess his claim, we consider the factors of "'presence at the scene of the crime, companionship, and conduct before and after the offense.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.) "'Mere presence at the scene of a crime which does not itself assist its commission or mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.'" (*People v. Pettie* (2017) 16 Cal.App.5th 23, 57.) Whether Jasso provided assistance is a question of fact, so "all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment." (*People v. Mitchell* (1986) 183 Cal.App.3d 325, 329.)

The video evidence is fairly interpreted as showing more than Jasso's mere presence during the shooting. He walked out onto Paradise Road several seconds

before Juan appeared on camera, during which time Rubio was heading northeast toward Velma Avenue. Jasso testified that Rubio approached him and Kasey Villegas as they were walking to Jasso's car, but the video permits the finding it was Jasso who approached Rubio. Kasey Villegas did not enter the street until approximately 10 seconds later, after Rubio had been shot, and he was walking behind Jose.

Jose's trial counsel argued the video showed Rubio having some kind of "reaction" at or near the time Juan walked in front of the Bronco. Juan's trial counsel similarly argued Rubio was already "reacting to something in front of him" and it was "doubtful" he could see Juan, who was farther off to his right, because the Bronco was in between them. The video and surrounding circumstances support the inference Jasso engaged with Rubio as a diversionary measure, i.e., he distracted Rubio to help facilitate the ambush by Juan. Such behavior constitutes aiding and abetting. (See, e.g., *People v. Ngaue* (1992) 8 Cal.App.4th 896, 906–907.)

In his reply brief, Jasso argues "[a] distraction was not necessary for Juan to safely shoot Rubio." He misses the point. "The 'act' required for aiding and abetting liability need not be a substantial factor in the offense." (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743; accord, *People v. Franzen* (2012) 210 Cal.App.4th 1193, 1216.) "'It has been held, therefore, that one who is present for the purpose of diverting suspicion, or to serve as a lookout, or to give warning of anyone seeking to interfere, … or to drive the "getaway" car and to give direct aid to others in making their escape from the scene of the crime, is a principal in the crime committed.'" (*Swanson-Birabent*, at pp. 743–744.)

"Giving a false statement evincing consciousness of guilt is another circumstance tending to prove aiding and abetting." (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 602; see *People v. Showers* (1968) 68 Cal.2d 639, 643 ["False statements regarding incriminating circumstances constitute evidence which may support an inference of consciousness of guilt"].) The jury may thus have considered Jasso's dishonesty in his custodial interview and on the witness stand. He initially denied even being in Lamont on the day of the shooting. When detectives showed him a surveillance image of his vehicle, he told them, "It's not my car." At trial he claimed to have "dodged behind the car" upon seeing Rubio reach for a gun, but the video showed Jasso was in the street and in front of the Bronco the entire time. The jury could have also concluded, as argued by the prosecutor, the video disproved Jasso's testimony that he "ran to the gate and closed the gate" before fleeing.

"As noted, a defendant's conduct after a crime, including flight, is a relevant factor in determining his liability for aiding and abetting the crime." (*People v. Garcia* (2008) 168 Cal.App.4th 261, 274.) Jasso's flight was especially probative considering he drove Juan to and from the crime scene. He testified Juan was a fellow gang member, a frequent companion, and someone he had known "for a long time." Juan ran directly to Jasso's car after shooting Rubio, clearly expecting the assistance in flight that Jasso provided.

The evidence permitted the inference the trip to Lamont was directly related to Jose's problems with Rubio. (See *People v. Glukhoy*, *supra*, 77 Cal.App.5th at p. 599 ["Motive is another circumstance to be considered in determining aiding and abetting liability"].) Jasso admitted Jose was a friend and fellow gang member,

and the jury was free to disbelieve his professed ignorance about the dispute with Rubio. For all these reasons, we reject Jasso's claim of insufficient evidence.

(ECF No. 15-5 at 17–20.)

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. "Under Jackson, federal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

"'After AEDPA, we apply the standards of Jackson with an additional layer of deference' to state court findings." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011) (alteration omitted) (quoting Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005)). As the Supreme Court has stated,

> Jackson . . . makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)).

Petitioner argues that the prosecution was required to prove that he had the specific intent to kill, but there was no direct evidence, the verdict was based on speculative inferences, and witness testimony did not definitively link Petitioner to his codefendant's actions. (ECF No. 1 at

133–35; ECF No. 32 at 12–13.) Respondent contends that a fairminded jurist could agree that the videos and evidence "provided more than sufficient evidence which the state court could draw reasonable inferences supporting the aiding and abetting requirement" and that a federal habeas court should not "re-analyze the evidence for inferences contrary to the judgement." (ECF No. 17 at 16.)

"Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." Ngo, 651 F.3d at 1114 (internal quotation marks omitted) (quoting Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995)). Viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, the jury could have inferred from the video, the fact that Petitioner drove Juan to and from the crime scene, and the nature of Petitioner's relationship with Juan that Petitioner "engaged with Rubio as a diversionary measure, i.e., he distracted Rubio to help facilitate the ambush by Juan," which "constitutes aiding and abetting." (ECF No. 15-5 at 19.) "Although the evidence presented at trial could yield an alternative inference, we 'must respect the exclusive province of the [jury] to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts.'" Long v. Johnson, 736 F.3d 891, 896 (9th Cir. 2013) (quoting United States v. Archdale, 229 F.3d 861, 867 (9th Cir. 2000). "The jury in this case was convinced, and the only question under Jackson is whether that finding was so insupportable as to fall below the threshold of bare rationality." Coleman, 566 U.S. at 656.

Petitioner argues that there was contradictory evidence in the record, pointing to his own testimony and Juan Montano's written declaration presented at a July 12, 2023 resentencing. (ECF No. 32 at 13.) With respect to Petitioner's testimony, based on the jury's verdict, the jury clearly did not find Petitioner's testimony to be credible, and a "jury's credibility determinations are . . . entitled to near-total deference under Jackson." Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004). Further, a reviewing state court "faced with a record of historical facts that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution," Jackson, 443 U.S. at 326, "and that [state court] determination in turn is entitled to considerable deference under AEDPA," Coleman, 566

1  U.S. at 656. With respect to Juan Montano's written declaration, "AEDPA . . . restricts the scope
2  of the evidence that we can rely on in the normal course of discharging our responsibilities under
3  § 2254(d)(1)." Murray v. Schriro, 745 F.3d 984, 998 (9th Cir. 2014). "AEDPA's 'backward-
4  looking language requires an examination of the state-court decision at the time it was made. It
5  [then logically] follows that the record under review is limited to the record in existence at that
6  same time, *i.e.*, the record before the state court.'" Id. (alteration in original) (quoting Cullen v.
7  Pinholster, 563 U.S. 170, 182 (2011)). Accordingly, this Court cannot consider Juan Montano's
8  written declaration that was not before the state courts on direct appeal.

9         The Supreme Court has "made clear that Jackson claims face a high bar in federal habeas
10  proceedings because they are subject to two layers of judicial deference." Coleman, 566 U.S. at
11  651. "When the deference to state court decisions required by § 2254(d) is applied to the state
12  court's already deferential review," Cavazos, 565 U.S. at 7, the Court finds that the state court's
13  decision denying Petitioner's sufficiency of evidence claims was not contrary to, or an
14  unreasonable application of, clearly established federal law, nor was it based on an unreasonable
15  determination of fact. The decision was not "so lacking in justification that there was an error
16  well understood and comprehended in existing law beyond any possibility for fairminded
17  disagreement." Richter, 562 U.S. at 103. Petitioner has not demonstrated that "no 'fairminded
18  juris[t]' could have reached the same judgment as the state court." Shinn v. Ramirez, 596 U.S.
19  366, 378 (2022) (alteration in original) (quoting Harrington, 562 U.S. at 102). Accordingly,
20  Petitioner is not entitled to habeas relief on his first claim, and it should be denied.

21         **B.  Instructional Error**

22         In his second claim for relief, Petitioner asserts that the trial court erred in instructing the
23  jury with CALCRIM No. 1403. (ECF No. 1 at 136–38.) Respondent argues that this claim fails
24  on the merits because it is a matter of state law. (ECF No. 17 at 17.) The California Court of
25  Appeal denied the claim in a reasoned opinion. The California Supreme Court summarily denied
26  Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the
27  Court will "look through" the summary denial and examine the decision of the California Court
28  of Appeal. See Wilson, 584 U.S. at 125.

In denying the instructional error claim, the California Court of Appeal stated:

The following version of CALCRIM No. 1403, which is a limiting instruction, was given to the jury without objection:

> "You may consider evidence of gang activity only for the limited purpose of deciding whether:
>
> > "• The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crime, enhancements, and special circumstances allegations charged;
>
> "OR
>
> > "• The defendant had a motive to commit the crime charged;
>
> "OR
>
> > "• The defendant actually believed in the need to defend himself.
>
> > "You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

Jasso claims CALCRIM No. 1403 is unlawful to the extent it allows consideration of gang evidence to determine whether a defendant actually believed in the need to defend himself. He alleges this effectively tells jurors that "gang members are subject to a different standard for self-defense." Jasso submits the alleged error affects his substantial rights and, therefore, the claim is not forfeited. He alternatively claims IAC based on his trial counsel's failure to object. Jose summarily joins in these arguments. Juan joins in the claim and makes additional arguments.

In *People v. Kaihea* (2021) 70 Cal.App.5th 257 (*Kaihea*), the Third Appellate District held the disputed portion of CALCRIM No. 1403 is "correct in law." (*Id.* at p. 265.) The opinion discusses how a challenge to the "motive" language of the instruction was rejected in *People v. Samaniego* (2009) 172 Cal.App.4th 1148, which says "[g]ang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related." (*Id.* at p. 1167.) The *Kaihea* court "further note[d] that motive, self-defense, and heat of passion are similar in that they all relate to the reason why a defendant engaged in the alleged conduct." (*Kaihea*, at p. 265.)

The *Kaihea* appellant and his codefendant were Tongan Crips gang members who had fought with two Norteño gang members. "[A] state of war existed between the two gangs at the time." (*Kaihea, supra,* 70 Cal.App.5th at p. 262.) As in this case, the altercation was captured on video. (*Id.* at p. 261.) At some point during the fight, one of the Norteños stabbed the codefendant multiple times in the chest. The appellant shot at both Norteños, killing one of them, but the bullets entered the decedent's body from behind and there was evidence he was killed while trying to run away. (*Id.* at p. 261.)

The *Kaihea* appellant claimed self-defense and defense of others. (*Kaihea*, *supra*, 70 Cal.App.5th at p. 263.) So "the question was why did [he] shoot [the decedent]—was it because he was motivated to kill a warring gang rival, was it because he believed in the need to defend himself or others, or was it because of a sudden quarrel/heat of passion?" (*Id.* at p. 265.) The appellate court said "[t]he interrelationship of these reasons for engaging in homicidal conduct has long since been recognized; evidence of motive is relevant to refute a claim of self-defense or sudden quarrel/heat of passion." (*Ibid.*)

The *Kaihea* appellant's gang activity "logically informed a determination of whether he was motivated to kill a gang rival because of the war between his gang and the Norteños. Moreover, [he] had a personal gang-related motive—his brother was killed by Norteños in the first skirmish in the ongoing war between the two gangs. CALCRIM No. 1403, as given, was thus, correct in law as it informed the jury it could consider gang evidence for the limited purpose of establishing whether defendant actually believed in the need to defend himself." (*Kaihea*, *supra*, 70 Cal.App.5th at p. 266.)

Here, there was evidence the dispute between Jose and Rubio arose over gang graffiti on a house formerly occupied by Rubio's grandmother. The gang expert testified, "When it's regarding the graffiti, it's showing that a—or the victim is challenging the Varrio Bakers gang member [Jose] regarding the tagging so that member of the Varrio Bakers now has to assist in that hyperviolence by now calling additional subjects over and then committing the primary activity of the murder." For the jury to evaluate Juan's various defenses, it had to determine whether he shot Rubio because Rubio pulled out a gun, or because Rubio had threatened to harm his brother, or because Rubio had disrespected the Varrio Bakers, or a combination of those things. Therefore, based on the holding of *Kaihea*, defendants' claim of instructional error fails on the merits.

The *Kaihea* opinion further holds "that gang evidence is relevant to defense of others." (*Kaihea*, *supra*, 70 Cal.App.5th at p. 265.) Therefore, CALCRIM No. 1403 may be modified upon request to allow consideration of gang evidence "for the limited purpose of deciding whether the defendant actually believed in the need to defend himself or *someone else*." (*Kaihea*, at p. 267.) This holding is relevant to a specific argument made by Juan.

In his briefing, Juan complains the instruction used at trial "did not permit evidence of Rubio's gang association to decide whether Juan actually believed he needed to defend Jose," which allegedly "undermined Juan's defense." The assertions are made in support of his argument that CALCRIM No. 1403 is unlawful. However, because the instruction is legally correct, it was "incumbent [upon him] to request clarifying language, and his failure to do so forfeits the issue." (*Kaihea*, *supra*, 70 Cal.App.5th at p. 265.) Although Juan summarily joins in Jasso's claim of IAC, neither Jasso nor Juan have argued their trial lawyers should have requested clarifying language.

Insofar as Juan might now allege IAC based on his counsel's failure to request that defense of others language be added to the instruction, prejudice is lacking. In *Kaihea*, the same IAC claim was rejected because the appellant could only have benefitted from the omission: "[S]ince the instruction limited the purpose for which the gang evidence could be used to whether [he] actually believed in the need to defend himself and told the jury it could not be used for any other purpose (other than the other three listed limited purposes), the instruction effectively

barred the jury's use of the gang evidence to *negate* defense of others." (*Kaihea*, *supra*, 70 Cal.App.5th at p. 267, italics added.)

Juan's prejudice argument fails for other reasons. First, there was virtually no evidence of "gang activity" by Rubio probative of whether Juan actually believed in the need to use lethal force to defend Jose. Rubio had "Varrio Chico Lamont" etched into his cell phone, and there were photos on his Facebook account of him flashing gang signs, but there was no indication Juan had knowledge of those facts on the day of the shooting. Second, the instruction did not preclude the jury from considering the evidence of Rubio's alleged threats to shoot and kill Jose and of his alleged possession of a firearm. There is no likelihood the jury would have accepted Juan's defense of others theory, instead of returning its verdicts of premeditated murder and lying in wait, but for the wording of the CALCRIM No. 1403 instruction.

(ECF No. 15-5 at 51–54.)

A federal court's inquiry on habeas review is not whether a challenged jury instruction "is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Middleton v. McNeil, 541 U.S. 433, 437 (2004). The "only question for [a federal habeas court] is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp, 414 U.S. at 147). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147).

CALCRIM No. 1403 instruction as given was a correct statement of state law. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Petitioner cites no Supreme Court authority holding that gang evidence cannot be considered when a jury determines whether a defendant acted in self-defense. The instruction specifically stated: "You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that

///

1    he has a disposition to commit crime." (13 RT[12] 2940.) "A jury is presumed to follow its

2    instructions." <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000) (citing <u>Richardson v. Marsh</u>, 481

3    U.S. 200, 211 (1987)).

4         Further, there is no likelihood the jury would have accepted a self-defense theory, instead

5    of returning its verdicts of premeditated murder and lying in wait, but for the CALCRIM No.

6    1403 instruction. "The lying-in-wait special circumstance requires an intentional murder,

7    committed under circumstances which include (1) a concealment of purpose, (2) a substantial

8    period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a

9    surprise attack on an unsuspecting victim from a position of advantage." <u>People v. Cruz</u>, 44 Cal.

10   4th 636, 679 (2008) (brackets, internal quotation marks, and citations omitted). By finding the

11   lying in wait special circumstance true, the jury necessarily rejected the theory that Juan acted

12   because he believed he or another was in imminent danger of great bodily injury or death.[13]

13   Considering the CALCRIM No. 1403 instruction in the context of the instructions as a whole,

14   the trial record, and the jury's true finding on the lying in wait special circumstance, it cannot be

15   said that the "instruction by itself so infected the entire trial that the resulting conviction violates

16   due process." <u>Cupp</u>, 414 U.S. at 147.

17        Accordingly, the Court finds that the state court's rejection of the CALCRIM No. 1403

18   instructional error claim was not contrary to, or an unreasonable application of, clearly

19   established federal law, nor was it based on an unreasonable determination of fact. The decision

20   was not "so lacking in justification that there was an error well understood and comprehended in

21   existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103.

22   Therefore, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

23   **C. Cumulative Error**

24        In his third claim for relief, Petitioner asserts that the cumulative effect of multiple errors

25   during his trial resulted in a violation of due process. (ECF No. 1 at 139.)  Specifically, Petitioner

---

[12] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent. (ECF Nos. 12–13.)

[13] "Perfect self-defense requires that 'one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury.'" <u>People v. Thomas</u>, 14 Cal. 5th 327, 386 (2023) (citation omitted). "Imperfect self-defense . . . 'occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death.'" <u>Id.</u> (citation omitted).

1    points to the erroneous jury instruction CALCRIM No. 1403, the admission of prejudicial gang

2    evidence, and denial of due process.[14] (ECF No. 32 at 17–18.) Respondent argues that Petitioner

3    has not shown that rejection of his cumulative error claim violated any right clearly established

4    by the Supreme Court. (ECF No. 17 at 20.)

5        The California Court of Appeal denied the claim in a reasoned opinion. The California

6    Supreme Court summarily denied Petitioner's petition for review. As federal courts review the

7    last reasoned state court opinion, the Court will "look through" the summary denial and examine

8    the decision of the California Court of Appeal. See Wilson, 584 U.S. at 125.

9        In denying the cumulative error claim, the California Court of Appeal stated:

10       Under the cumulative error doctrine, "a series of trial errors, though
         independently harmless, may in some circumstances rise by accretion to the level
11       of reversible and prejudicial error." (People v. Hill (1998) 17 Cal.4th 800, 844;
         accord, People v. Capers (2019) 7 Cal.5th 989, 1017.) Giving due consideration
12       to the collective impact of the errors found herein, we conclude further reversal of
         the judgments beyond count 2 and the gang-related enhancements is unwarranted.
13

14    (ECF No. 15-5 at 64–65.)

15       "The Supreme Court has clearly established that the combined effect of multiple trial

16    court errors violates due process where it renders the resulting criminal trial fundamentally

17    unfair. . . . even where no single error rises to the level of a constitutional violation or would

18    independently warrant reversal." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing

19    Chambers v. Mississippi, 410 U.S. 284, 298, 302–03, 290 n.3 (1973)). The Ninth Circuit has

20    "granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry'

21    of otherwise harmless errors, such that they amplify each other in relation to a key contested

22    issue in the case." Ybarra v. McDaniel, 656 F.3d 984, 1001 (9th Cir. 2011) (citing Parle, 505

23    F.3d at 933).

24       Here, Petitioner asserts that the cumulative effect of multiple errors—specifically the

25    erroneous jury instruction CALCRIM No. 1403, the admission of prejudicial gang evidence, and

26    denial of due process (without further explication)—resulted in a violation of due process. (ECF

27

28    _____
      [14] Petitioner does not otherwise explain what specific actions taken by the trial court denied him due process.

No. 32 at 17–18.) However, as set forth in section IV(B), *supra*, there was no state law or federal constitutional error regarding jury instruction CALCRIM No. 1403. Petitioner does not otherwise explain what specific actions taken by the trial court denied him due process. With respect to the admission of prejudicial gang evidence, the Supreme Court recently clarified that "clearly established law provide[s] that the Due Process Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial fundamentally unfair." Andrew v. White, 145 S. Ct. 75, 83 (2025). The Ninth Circuit has held that "[o]nly if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'" Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991) (quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986)). See Kipp v. Davis, 971 F.3d 939, 956 (9th Cir. 2020) ("[W]e have found no due process violation where there *were* permissible inferences that the jury could draw from the challenged evidence."). As set forth in section IV(B), *supra*, there is no Supreme Court authority holding that gang evidence cannot be considered when a jury determines whether a defendant acted in self-defense, and Petitioner does not establish that there were no permissible inferences the jury may draw from the admitted gang evidence.[15]

Where "no error of constitutional magnitude occurred, no cumulative prejudice is possible." Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011). See Waidla v. Davis, 68 F.4th 575, 599 (9th Cir. 2023) ("In assessing a cumulative error claim, we do not consider the prejudicial effect of nonexistent errors."). Based on the foregoing, the state court's denial of Petitioner's cumulative error claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his third claim, and it should be denied.

///

---

[15] Additionally, given the jury was evenly divided on the gang special circumstance allegation that was ultimately dismissed, (ECF No. 15-5 at 16), it is unlikely that the jury's exposure to the gang evidence was unduly prejudicial and prevented a fair trial.

1

**V.**

2

**RECOMMENDATION**

3     Based on the foregoing, the Court HEREBY RECOMMENDS that the petition for writ of

4 habeas corpus be DENIED.

5     This Findings and Recommendation is submitted to the assigned United States District

6 Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

7 Rules of Practice for the United States District Court, Eastern District of California. Within

8 **THIRTY (30) days** after service of the Findings and Recommendation, any party may file

9 written objections with the Court, **limited to fifteen (15) pages in length, including any**

10 **exhibits**. Such a document should be captioned "Objections to Magistrate Judge's Findings and

11 Recommendation." Replies to the objections shall be served and filed within fourteen (14) days

12 after service of the objections. The assigned District Judge will then review the Magistrate

13 Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file

14 objections within the specified time may waive the right to appeal the District Court's order.

15 Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d

16 1391, 1394 (9th Cir. 1991)).

17

18 IT IS SO ORDERED.

19 Dated:   **June 26, 2025**

20                 STANLEY A. BOONE
                   United States Magistrate Judge

21

22

23

24

25

26

27

28